UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AYUSH KHANNA,

          Plaintiff,

    v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

          Defendants.

Case No. 25-cv-06965-JCS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT, DENYING MOTION TO STRIKE SECOND AMENDED COMPLAINT AND GRANTING MOTION FOR LEAVE TO AMEND**

Re: Dkt. Nos. 29, 31, 34, 35

## I. INTRODUCTION

Ayush Khanna brings this action on his own behalf and as next friend of his minor child, A.K., asserting civil rights claims in connection with events that occurred in August 2023, when officers of the San Francisco Police Department responded to a domestic violence complaint by his wife, which led to Ayush's arrest and the temporary placement of his son (of whom Ayush has sole custody) into foster care. Presently before the Court are the following motions: 1) Motion to Dismiss Second Amended Complaint ("Motion to Dismiss"); 2) Motion to Strike Second Amended Complaint ("Motion to Strike"); and 3) Motion for Leave to File Second Amended Complaint ("Motion for Leave to Amend"). A hearing on the motions was held on May 27, 2026. For the reasons stated below, the Motion to Strike is DENIED. The Motion for Leave to Amend is GRANTED. The Motion to Dismiss is GRANTED in part and DENIED in part.[1]

## II. MOTION TO STRIKE AND MOTION FOR LEAVE TO AMEND

This case was filed on August 18, 2025. Because counsel for the City Attorneys' Office was in a three-week trial, Plaintiff agreed to a one-month extension of Defendants' deadline to

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

respond to the complaint.  Dkt. no. 10 (extending response deadline to October 27, 2025). Plaintiff agreed to an additional extension of the deadline to respond to December 1, 2025 in order to provide additional time for the City Attorney's Office to determine legal representation of  two defendants whom counsel had not been able to reach and to allow for informal settlement discussions.   Dkt. no. 12.  On November 11, 2025, well before Defendants' response was due, Plaintiff's counsel notified Defendants' counsel that an amended complaint would be filed "in the coming days" "based on [the parties'] verbal agreement."  Dkt. no. 38-1 at ECF p. 2.  In an email response dated November 12, 2025, Defendants' counsel confirmed that they would "not oppose plaintiffs['] amending the complaint." *Id.*  at ECF p. 2. The First Amended Complaint was filed on November 29, 2025.  Dkt. no. 27.

On December 16, 2025, the parties entered into a stipulated briefing schedule for Defendants' anticipated motion to dismiss because "the deadlines, by statute, conflict[ed] with upcoming holidays and family vacations[.]"  Dkt. no. 19.  Under that stipulation, Defendants were given a four-day extension to file their motion, to December 18, 2025, which would have resulted in an Opposition deadline of January 2, 2026 under the Civil Local Rules; however, the parties agreed to extend that deadline by two weeks, to January 16, 2026.  *Id.*

Defendants filed a motion to dismiss and a motion to strike the First Amended Complaint on December 18, 2025. On January 16, 2026, Plaintiff filed a Second Amended Complaint in lieu of filing an opposition brief.  The Court, in turn, denied Defendants' motions to dismiss and to strike the First Amended Complaint as moot in an order dated January 26, 2026.  Dkt. no. 28 ("January 26 Order"). Although it is apparent from the Court's Order that the Court accepted the Second Amended Complaint as the operative complaint, Defendants did not ask the Court to reconsider that order.  Instead, they renewed their motion to strike as to the Second Amended Complaint, this time adding the argument that the Court should strike the Second Amended Complaint on the basis that Plaintiffs did not obtain a stipulation or leave of court before filing it and that it was untimely under Rule 15(a) of the Federal Rules of Civil Procedure.[2]  They also

---

[2] Defendants also appear to contend that because Plaintiff did not file an opposition to their previous motion to dismiss he has waived any arguments that could have been made in such an

United States District Court
Northern District of California

argue that numerous allegations in the Second Amended Complaint should be stricken under Rule 12(f) on the basis that they are "vexatious," "abusive" and "harassing."  The Court rejects both arguments.

Under Rule 15(a) of the Federal Rules of Civil Procedure, "[a] party may amend its pleading once as a matter of course no later than: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed.R.Civ.P.  15(a)(1).  Otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed.R.Civ.P. 15(a)(2).  The Rule makes clear that "[t]he court should freely give leave when justice so requires." *Id.*

Defendants argue that the Second Amended Complaint could only have been filed pursuant to a stipulation or with leave of court because Plaintiff had already amended once as of course by filing the First Amended Complaint.  In any event, they contend, under Rule 15(a)(1)(B), the Second Amended Complaint had to be filed by January 9, 2026 to meet the 21-day deadline and it was, instead, filed on January 16, 2026 (that is, 28 days after service of the motion rather than 21 days after service of the motion).  Plaintiff counters that because he filed the First Amended Complaint pursuant to an agreement with Defendants, that complaint was not filed "as of course" and therefore, he could file his Second Amended Complaint as of course.  He further asserts that the Second Amended Complaint was timely because it was filed by the response deadline to which the parties agreed.

The Court need not decide whether the First Amended Complaint was an amendment "as of course" or whether Defendants are technically correct that the Second Amended Complaint should have been filed by January 9, 2026.  It is apparent that Plaintiff believed in good faith that the deadline to file a Second Amended Complaint was governed by the parties' stipulation

---

opposition and therefore the case should be dismissed in its entirety (although their argument on this point is garbled and unclear). *See* Motion to Strike at 5 ("Regardless, Plaintiffs did they file an opposition to the MTD, and therefore any responses should be deemed waived and dismissing the action.").  Given that the Court accepted the Second Amended Complaint as the operative complaint, this argument is frivolous.

United States District Court
Northern District of California

United States District Court
Northern District of California

extending the response deadline to January 16, 2026.  The one-week delay resulted in no prejudice to Defendants.  Furthermore, any question about whether the Second Amended Complaint had been accepted as the operative complaint was laid to rest by the Court's January 26 Order which could not have concluded that Defendants' motion to dismiss was moot without accepting for filing the Second Amended Complaint.  Defendants nevertheless chose to seek dismissal of the entire case on this ground.

While Defendants' counsel are entitled to pursue aggressive litigation tactics, the Court expects counsel to be mindful of the burden such tactics impose on the parties and the Court.  The challenge to the filing of the Second Amended Complaint is frivolous, especially in light of the Court's January 26 Order.  To be perfectly clear, to the extent Plaintiff's filing of the Second Amended Complaint may not have been in compliance with Rule 15 of the Federal Rules of Civil Procedure (a question the Court does not decide), the Court excuses any such failure to comply and finds that it is in the interests of justice to permit the filing of the Second Amended Complaint.

Likewise, the Court rejects Defendants' arguments under Rule 12(f).  Defendants spill much ink arguing that various allegations in the Second Amended Complaint are inconsistent with each other or with allegations in the First Amended Complaint.  They also feign outrage at certain allegations that they contend cast aspersions on the state court or are otherwise offensive.  The Court has reviewed these allegations and finds that Defendants' assertions are overblown.  These arguments may be appropriate at a later stage of the case, for example, when counsel presents Defendants' positions to a jury.  At the pleading stage, however, they are merely a time-consuming distraction.

For these reasons, the Court DENIES the Motion to Strike and GRANTS the Motion for Leave to Amend.

### III.    MOTION TO DISMISS

#### A.    Background

##### 1.  Second Amended Complaint

Plaintiff Ayush Khanna ("Ayush") is a citizen of India and a permanent resident of the United States who resided in San Francisco, California when the underlying events in this case

occurred. Compl. ¶ 4. His son, A.K., is a U.S. Citizen and was four years-old at that time. *Id.* ¶ 5. Defendants Samson Hung ("Officer Hung"), Michael Anthony Canning ("Sergeant Canning"), Ian Richards ("Officer Richards") and William Kraus ("Officer Kraus") were at all relevant times officers of the San Francisco Police Department ("SFPD"). *Id.* ¶¶ 6-9. Defendant Andrea Canziani was at all times relevant to the Complaint an employee of California's Child Protective Services ("CPS"). *Id.* ¶ 10. Candice Khanna ("Candice"), who is not a defendant in this action, is A.K.'s mother and was Ayush's wife at the time of the relevant events. *Id.* ¶ 15.

Plaintiff alleges that on August 18, 2023, "after weeks of documentation and following the presentation of evidence to the court[],]" the San Francisco Superior Court (Commissioner Russell Roeca) issued a Temporary Restraining Order ("TRO") (Court Case FDV23-817048) that listed Ayush and A.K. as protected parties and Candice Khanna as the restrained party. *Id.* ¶ 16. The TRO "prohibited Candice Khanna from contacting Ayush or A.K., required Candice Khanna to move out of the residence she had shared with Ayush and A.K., ordered Candice Khanna to stay 100 yards away from Ayush and A.K., and granted Ayush sole legal and physical custody of A.K." *Id.*; *see also id.* ¶ 154 (alleging that valid DV-140 Custody Order was attached to the TRO); *id.* ¶ 19 (alleging that "[f]ollowing a long family court process, the TRO that was in effect on August 19, 2023 became a permanent restraining order that protects Ayush and A.K. from Candice to this day."). Ayush was unable to find a process server who would serve the TRO on his wife that day, but he arranged for one to serve the TRO on August 19, 2023. *Id.* ¶ 18. He alleges that he planned to take A.K. to the beach that day so that they would not be present when the TRO was served, but Candice discovered the TRO in the trunk of their car while Ayush and A.K. were still at home. *Id.* ¶¶ 18, 23.

According to Ayush, "Candice then aggressively confronted Ayush and eventually threatened to commit suicide if Ayush served the TRO." *Id.* ¶ 23. At this point, Ayush called 911, but he disconnected the call prior to speaking with 911 dispatch when his wife begged him not to involve the police. *Id.* ¶ 25. Ayush alleges that he "called 911 a second time shortly thereafter." *Id.* In the meantime, Candice "entered a bathroom, locked the door, and told Ayush she was calling a suicide prevention hotline" but she "actually contacted 911 and falsely accused

Ayush of domestic violence." *Id.* On recordings made by Ayush, "Candice can be heard threatening to commit suicide and making other threatening and erratic statements." *Id.* ¶ 32. Officer Hung, who apparently listened to the recordings later that night, after Ayush's arrest, noted that he "heard what appeared to be pills being shaken around in a bowl" in one recording. *Id.*

SFPD officers responded to the scene, including Officers Hung, Richards and Kraus. *Id.* ¶¶ 27, 34. Officer Hung appeared to be in charge of the investigation. *Id.* ¶ 30. Ayush alleges that at all times he was "calm and fully cooperated with SFPD officers." *Id.* ¶ 27. He alleges that he "informed the officers of the unserved TRO and provided it to them" and that the officers confirmed it was valid and served the TRO on Candice "on scene." *Id.* ¶¶ 27, 37*; see also id.* ¶ 36 (alleging that "Ayush provided SFPD officers with a valid file stamped TRO along with the approximately 60 pages that was to be served along with, and ostensibly supported the issuance of, the judicial order. The TRO and related attachments provide descriptions and evidence of numerous incidents of Candice Khanna's domestic violence and threats against both Ayush and A.K. Evidence referenced in the TRO and attachments included transcripts of recordings that Ayush had made to document Candice's acts of domestic violence and coercive control[.]") According to Ayush, he "informed SFPD officers that Candice had a history of physical abuse against Ayush and A.K., and that this had prompted Ayush to seek the TRO." *Id.* ¶ 29. He "also told SFPD officers that he had audio recordings of prior incidents of domestic violence perpetrated by Candice Khanna against Ayush and A.K." *Id.*

Officer Hung asked Candice "if she had ever attacked Ayush" and she responded, "Not today," which Ayush alleges was a "red flag" as it "clearly implie[d] that Candice had attacked Ayush in the past." *Id.* ¶ 28. Ayush alleges that Officer Hung nonetheless refused to consider the evidence he offered and "persisted to attempt to contrive a reason to arrest Ayush," even though Ayush's evidence "clearly established that Candice was the dominant aggressor" and despite the fact that other officers on scene "listened to some of the evidence that Ayush presented and questioned Hung's decisions[.]" *Id.* ¶¶ 30-31. Nor did the officers separate Candice from A.K. after serving the TRO, "proceed[ing] as if [the TRO] did not exist." *Id.* ¶ 38; *see also id.* ¶ 43 (alleging that A.K remained in Candice's arms while the officers questioned her).

Ayush alleges that Candice "repeatedly lied to the officers on the scene, stating, *inter alia*, that she never knew what the papers (the TRO) were, that she never threatened suicide, and that she (not Ayush) was the one that had planned to take A.K. to the beach that day." *Id.* ¶ 34. He further alleges that "[b]ody camera video shows that Officer Kraus understood Candice had lied about those and numerous other important facts" and that it "appear[ed] from the video that Officer Richards also shared Officer Kraus' opinion in regard to Candice's untruthfulness" but that "both of them failed to intervene to stop the unlawful arrest" of Ayush. *Id.*

One example Ayush offers of a lie that the officers allegedly ignored was Candice's statement to them that she had filed for divorce but had not yet paid the filing fee. *Id.* According to Ayush, "SFPD officers should have been aware that filing fees are required to file court actions and that Candice's statement could not be true." *Id.* Ayush alleges that "[w]hat was true was that Ayush had actually filed for divorce on August 17, 2023." *Id.* This information could have been verified, Ayush alleges, but the Officers "perplexingly failed to do so." *Id.*

According to the police report, the officers observed " 'redness' on Candice Khanna's face and chest" when they arrived at the scene but Ayush alleges that " '[r]edness" is inconsistent with Candice Khanna's contrived, false, and unbelievable claim that Ayush 'punched Candice Khanna several times in the face with a closed right fist' allegedly causing Candice Khanna to 'possibly black out for a split second.' " *Id.* ¶ 39. According to Ayush, "[t]he alleged injuries, 'redness' as described in the police report, are clearly inconsistent with multiple closed-fist punches delivered by a grown adult male to the face of an adult female of Candice's size with force capable of causing or nearly causing loss of consciousness." *Id.* Ayush further alleges that "[i]t is also inconsistent with a lack of marks or redness on Ayush's hands/knuckles and Ayush's and A.K.'s calm demeanors." *Id.* Indeed, according to Ayush, Officer Kraus can be heard on his body camera footage "pointing out to Officer Hung that the 'redness' on Candice's face was completely inconsistent with her claims/story" and stating, "[s]he's clearly lying to us[.]" *Id.*

Ayush further alleges that when A.K. was questioned by the officers about the "violence alleged by Candice" he told them that that "nothing happened" but that *he* had hit his mom. *Id.* ¶ 2. According to Ayush, the officers did not follow up to find out what A.K. meant. *Id.* The

7

officers "stated that A.K. 'appeared normal, calm, and cheerful' and had no 'visible marks or injuries.' " *Id.* ¶ 44.

Ayush also includes extensive allegations based on body camera footage recently produced to him describing telephone conversations between Officer Hung and his supervisor, Sargeant Canning, who is also named as a defendant:

174. . . . Fifty minutes into this call for service (22:57:33 BWC timestamp – Hung 1 Video), Officer Hung called Sergeant Canning. In this call, Hung tells his Sergeant Canning that the suspect (Ayush) has audio recordings that pretty much substantiate Ayush's side of the story. Hung also told . . . Canning that there[ ] were some loopholes in the victim's statements and provided some additional details. Officer Hung and Sergeant Canning's phone call lasted for approximately sixteen minutes. At the conclusion of the phone call, Officer Kraus and Officer Hung had a brief exchange: Kraus: "*Who'd you talk to*?" Hung: "*Canning.*" Kraus: "*What was his thoughts*?" Hung: "*He was like, oh, well, if you have PC to arrest this guy, then do it. He was like… it sounds like you have a DV and a 51-50, so…*" Kraus: "*But do we have any evidence that he hit her? I mean, it's all basically her statement at this point.*" Officer Hung summarized his 16-minute phone conversation with Sergeant Canning as simply: "*If you have PC to arrest this guy, then do it.*" (23:40:37 BWC timestamp – Hung 1 Video) Officer Hung was in the back of the aid car when Officer Kraus came to the door and informed Officer Hung that Sergeant Canning was attempting to contact him. Officer Hung then called Sergeant Canning. During this phone call, Officer Hung says: "*At this point, I'm kind of inclined to just book this guy, the male party, and just let the court system figure it out at this point.*" . . . Officer Hung continued by saying: "*Because she does have the redness, uhm, whether or not, uhm, she did it to herself or not, or whether he did it to her, I think at this point based upon the injuries and the physical redness we have enough.*" . . .

175. Also, within this same phone call, at approximately 23:44:40 (BWC timestamp –Hung 1 Video) Officer Hung says to Sergeant Canning: "*So I don't know if you want to come out here, or not, to kind of . . .*" This statement should have caught the Sergeant's ear. Had Sergeant Canning given proper consideration, he would have recognized Hung's statement as a plea for help. Officer Hung attempted to conceal and not openly admit to his supervisor that he was overwhelmed. This plea for help is also consistent with the statement from Officer Kraus to Officer Hung that occurred 47-minutes earlier, "*I think we'd better get the Sergeant out here.*" At this time, we are more than 90 minutes into this misdemeanor DV assault with a total of three officers and an aid car on the scene, and Officer Hung had essentially told his Sergeant he can't figure out the truth, so he's going to arrest the male and let the court sort it out. Additionally, as discussed above, the officer indirectly asked [the] Sergeant to come to the scene when he indicated hesitation concerning his intended course of action. . . . . To add insult to injury, at 00:56:29 (BWC timestamp – Hung 2 Video) Officer Hung calls Sergeant Canning. In the BWC video you can hear Sergeant

Canning's voice on the phone say something indistinguishable to Officer Hung. In response, Officer Hung chuckled and replied: "*Yes, I'm pretty stressed out.*" . . . Following the call, Officer Hung states, "*I guess we're all on our own.*" Officer Richards responds: "*Awesome.*" (stated in a sarcastic tone). This is further evidence that the officers were overwhelmed, without proper or suitable training, and lacked any meaningful supervision. 7- minutes after the conclusion of this last phone call, Mr. Khanna was arrested and A.K. was taken into State custody.

*Id.* ¶¶ 174-175 (emphasis in original).

Ayush also describes comments by Officers Richards and Kraus captured on body camera footage questioning whether Ayush should be arrested:

176. . . . Kraus: "*She's definitely lying to us. We know for a fact, she claims she knows nothing about a restraining order, we just listened to the tape and the whole argument started over the fact that she found the restraining order. She absolutely knows about the restraining order. He's got that on tape about them arguing.*"
Richards: "*She said once you file that in court, the court's not going to let me have my kid back.*"
Kraus: "*Everything she's telling us is bullshit. Those red marks on her face are uniform; there's no indication of her getting hit. ...I don't know about her credibility at this point.*"
Kraus: "*I think we'd better get the Sergeant out here.*"
Kraus: "*But do we have any evidence that he hit her? I mean, it's all basically her statement at this point.*"
Richards: "*Thing is, he's got custody, so he gets to decide where the kid goes.*"

*Id.* ¶ 176 (emphasis in original).

After approximately three hours on the scene, Officer Hung, with the approval of Sargeant Canning, arrested Ayush for violation of Cal. Penal Code section 273.5 (corporal injury on a spouse/cohabitant). *Id.* ¶ 49. Ayush alleges that he "was calm and compliant as he was placed under arrest, handcuffed, searched (yielding nothing of note), transported to Taraval Station, and subsequently booked into County Jail #1 for violation of PC 273.5 . . . ." *Id.* ¶ 54. He further alleges that he asked the officers to release A.K. "to his friend who was on scene. . . identif[ying] the adult friend who was present at Ayush's home at the time[,]" "Mr. Kulvinder S. Gill." *Id.* ¶ 55. According to Ayush, Mr. Gill "was sober, willing and completely capable of caring for A.K." yet the officers "ignored Ayush's requests and proceeded to violate both Ayush's and A.K.'s rights by seizing A.K.'s person and transporting A.K. into the custody of Family and Child Services ('FCS') employees." *Id.* The officers were allegedly "instructed" to do so by Defendant

United States District Court
Northern District of California

Canziani in a telephone call with Officer Hung. *Id.* ¶ 56. Ayush further alleges that during the call, Canziani "consistently encouraged/suggested to Officer Hung that Hung should arrest Ayush . . . even though she is not a law enforcement officer, did not have knowledge of the evidence, and was never at the scene." *Id.*

Ayush alleges that after his arrest, Officer Hung "sought and was granted an Emergency Protective Order ('EPO') that named Candice Khanna as the protected party and Ayush as the restrained party." *Id.* ¶ 57. He further alleges that the EPO "was based on an entirely erroneous and contrived affidavit in support and was presented ex parte." *Id.* According to Ayush, "[t]he EPO . . . was contrived and granted as a matter of course AFTER the unlawful arrest of Ayush [and] bears not on the case before the Court, which is about the lack of cause to effectuate the arrest of Ayush and the separation of father and son." *Id.*

In the Second Amended Complaint, Ayush names Officer Hung, Officer Kraus, Officer Richards, Sergeant Canning and Andrea Canziani as individual defendants sued in their individual and official capacities and also names the City and County of San Francisco ("CCSF") as a defendant. He asserts eleven claims in the Second Amended Complaint, which are as follows:[3]

Claim One: Unlawful seizure in violation of the Fourth Amendment and 42 U.S.C. § 1983. *Id.* ¶¶ 77-79. This claim is based on allegations that, *inter alia*, "the seizure of Ayush and A.K. by SFPD were unreasonable and unconstitutional and no basis existed to deny Ayush's appointed adult with custody of A.K.[,]" *id.* ¶ 78, and that "the seizure of A.K. by defendant FCS was unreasonable and unconstitutional." *Id.* ¶ 79.[4] At oral argument, Plaintiff stipulated that this claim is asserted against Officer Hung, Sergeant Canning and Canziani and that the claim is dismissed without prejudice as to all other defendants.

Claim Two: False arrest in violation of the Fourth Amendment and 42 U.S.C. § 1983. *Id.* ¶¶ 82-89. This claim is based on allegations that, *inter alia*, "Officer Hung, Sergeant Canning, and

---

[3] Because Plaintiff has voluntarily dismissed Claims Eight, Ten and Eleven in response to Defendants' Motion to Dismiss, see dkt. no. 37 (Opposition to Motion to Dismiss) at 21-22, the Court summarizes here only the remaining claims. The Motion to Dismiss is GRANTED as to Claims Eight, Ten and Eleven and those claims are dismissed with prejudice.

[4] At oral argument, Plaintiff stipulated that FCS has not been named as a defendant in this case and is only sued to the extent it is subsumed within CCSF, which *is* a named defendant.

United States District Court
Northern District of California

other Defendant officers had no probable cause and/or lacked statutory authority to arrest Ayush on August 19, 2023[,]" *id.* ¶ 84, the "Officers did not have probable cause and/or lacked statutory authority to arrest, seize, detain, or otherwise take A.K. into custody on August 19, 2023[,]" *id.* ¶ 87, and "CPS workers violated A.K.'s Fourth Amendment rights by taking custody of A.K. for several days and failing to release A.K. to his father or to his father's chosen caregiver." *Id.* ¶ 89. At oral argument, Plaintiff stipulated that this claim is asserted against Officer Hung, Sargeant Canning and Canziani and that the claim is dismissed without prejudice as to all other defendants.

Claim Three: False Imprisonment and Unlawful Confinement/Abduction of a Child in violation of the Fourth Amendment and 42 U.S.C. § 1983. *Id.* ¶¶ 90-98. This claim is based on allegations that, *inter alia*, Ayush was arrested without probable cause and "[t]he totality of the circumstances dictated that no reasonable officer would have believed that they then and there had the authority to arrest Ayush[,]" *id.* ¶ 91; "Officer Hung and Sergeant Canning unlawfully arrested and caused Ayush to be imprisoned for over three days[,]" *id.* ¶ 93; "A.K. was taken into custody by the named Defendants and CPS on August 19, 2023 without probable cause, reasonable belief, or clear and convincing evidence that such action was necessary, warranted, or reasonable . . . amount[ing] to false imprisonment, unlawful confinement of a child, and child abduction[,]" *id.* ¶ 95; and "[t]he totality of the circumstances dictated that no reasonable officer or person would have believed that they had authority to take custody of A.K. and/or refuse to release A.K. to a caregiver of Ayush's choice." *Id.* ¶ 96. At oral argument, Plaintiff stipulated that this claim is asserted against Officer Hung, Sargeant Canning and Canziani and that the claim is dismissed without prejudice as to all other defendants.

Claim Four: Violation of the right to Equal Protection under the Fourteenth Amendment and 42 U.S.C. § 1983. *Id.* ¶¶ 99-109. This claim is based on allegations that, *inter alia*, "the officer's perception of the situation" was "colored" by the fact that "Ayush is male, an immigrant, and of a minority race" and "A.K. is male and of a minority race[,]" causing, Officer Hung to "disregard[ ] the facts of the situation and arrest[ ] Ayush without probable cause[,]" and "CPS employees [to] disregard[ ] the facts and seize[ ] and [take] custody of A.K. without any reasonable basis[,]" *id.* ¶ 101; "[t]he fact that Candice is a female caused the SFPD to give her

*United States District Court*
*Northern District of California*

preposterous statements undue credibility[,]" *id.* ¶ 102; "Ayush was arrested because Officer Hung, Sergeant Canning, and the other Defendant officers assumed that due to his gender, race, and nationality, Ayush was guilty despite the fact that the clear evidence and totality of the circumstances indicated Ayush had committed no crime[,]" *id.* ¶ 103; and that "A.K. was not allowed to go with the person who his father designated as caretaker was caused by and/or affected by Ayush's and Mr. Gill's race, gender and nationality." *Id.* ¶ 107. At oral argument, Plaintiff stipulated that this claim is asserted against all of the individual defendants.

Claim Five: Malicious prosecution and unlawful detention in violation of Fourth and Fourteenth Amendments and  42 U.S.C. § 1983. *Id.* ¶¶ 110-112. This claim is based on allegations that, *inter alia*, Officer Hung arrested Ayush without probable cause and Ayush was detained for three days; and that within one business day of Ayush's arrest the District Attorney rejected the case submitted by Officer Hung, declining to prosecute Ayush. *Id.* At oral argument, Plaintiff stipulated that this claim is asserted against Officer Hung only and dismissed the claim without prejudice as to all other defendants.

Claim Six: Unlawful Separation of Family/Interference with Familial Association in violation of First and Fourteenth Amendments and 42 U.S.C. § 1983. *Id.* ¶ 113-134. This claim includes separate allegations for Ayush and A.K. As to Ayush, the claim is based on allegations that, *inter alia*, Ayush "possessed a fundamental right & liberty interest in the care, custody, companionship, and management of his minor son, A.K." as was "explicitly recognized and secured by the valid Superior Court custody order granting him sole legal and physical custody of A.K.", and all Defendants, "with reckless disregard interfered with this fundamental right[,]" by "[a]rresting Ayush without probable cause, directly causing his physical separation from A.K.[,]" "[f]ailing and refusing to place A.K. with Ayush's designated caregiver (or otherwise act in accordance with his custodial rights) during his arrest, despite the absence of any emergency or threat to A.K.[,]" and "[f]acilitating and effectuating the seizure of A.K. by CPS, thereby preventing Ayush from exercising his court-ordered custody rights and separating the family unit." *Id.* ¶¶ 122-124. Ayush further alleges that "Defendants' actions were not justified by any compelling state interest" and "[t]here was no emergency or exigent circumstance

United States District Court
Northern District of California

12

threatening A.K.'s immediate health or safety that justified bypassing Ayush's fundamental rights and the existing court order." *Id.* ¶ 125.

As to A.K., the claim is based on allegations that, *inter alia*, "Defendants deprived A.K. of his right to familial association and bodily integrity by . . . [p]hysically seizing him from his home without legal justification (warrant, court order, or exigent circumstances)[,]" "[t]ransporting him against his will to a police station[,]" "[p]lacing him into the 'care and custody' of CPS/DCFS, thereby forcibly separating him from his father[,]" "[f]ailing and refusing to place him with his father's designated caregiver, as was his right under his father's custodial authority and the court order[,]" and "[f]ailing to investigate or make any finding based on clear and convincing evidence before placing A.K. in foster care." *Id.* ¶ 130. At oral argument, Plaintiff stipulated that this claim is asserted against all of the individual defendants.

Claim Seven: Failure to intervene to prevent violation of rights under 42 U.S.C. § 1983. *Id.* ¶¶ 135-140. This claim is based on the allegation that all of the officer defendants and Canziani had a duty and "an opportunity to intervene to prevent other officers from blatantly violating Ayush's and A.K.'s rights under the First, Fourth, Fifth, and Fourteenth Amendments" but did not do so. *Id.* ¶¶ 135-137. At oral argument, Plaintiff stipulated that this claim is asserted against Officers Kraus and Richards only and is dismissed without prejudice as to all other defendants.

Claim Eight: DISMISSED.

Claim Nine: *Monell* claims against the City and County of San Francisco. *Id.* ¶¶ 161-185. This claim is based on allegations that the violations of Ayush and A.K.'s rights are attributable to policies, customs and practices of SFPD and "FCS/CPS" and that "multiple civil rights complaints involving SFPD's misclassification of domestic violence incidents and gender-based assumptions have resulted in administrative findings, settlements, and/or litigation over the past 10 years due to [these] policies, customs, and practices[.]" *Id.* The policies, customs and practices of SFPD upon which this claim is based include:

- "SFPD has established the policy, custom, and/or practice of allowing officers to frequently act outside the scope of their authority and without proper supervision[;]" *id.* ¶ 169.

United States District Court
Northern District of California

- "SFPD has further established that it will not properly train, supervise, or educate officers on how to conduct themselves or properly assess and investigate situations. In fact, violations are encouraged by supervising officers, as is evidenced here[;]" *id.* ¶169.
- "SFPD, has established the policy, custom, and/or practice of encouraging its law enforcement personnel, including the named Defendants, to participate in violations of the rights of its citizens instead of intervening to protect their rights from bad actors within SFPD[;]" *id.* ¶ 170.
- "SFPD and the City have a policy and practice of encouraging its officers to effectuate arrests under the Domestic Violence Act even in the absence of probable cause to do so[;]" *id.* ¶ 171.
- "SFPD utterly failed to properly train and supervise its officers to prevent the types of violations that are present in this case" including "lack of meaningful supervision[.]" *Id.* ¶ 172.
- "SFPD operates in a paramilitary style of policing that discourages officers from intervening to prevent the violation of rights like those complained of herein." *Id.* ¶ 176.
- "It appears that not a single person on scene or off scene had been properly trained in how to properly deal with the placement of a minor into state custody. Had the SFPD and FCS employees involved been properly trained, they would have been aware it was appropriate to give custody of A.K. to Mr. Gill." *Id.* ¶ 177.

The policies, customs and practices of FCS upon which the claim is based include:

- "FCS has a policy, custom, and practice of failing to conduct investigations to determine whether clear and convincing evidence exists that a child is in imminent danger or that a justifiable emergency exists to remove a child from the custody of a custodial parent and/or to fail to place a child into the custody of a qualified and willing caretaker with whom the child is familiar. Instead, FCS employees take custody of children from the SFPD without asking vitally important questions like, 'Is there an available caretaker?' or 'Who did custodial parent choose when asked who they wanted to take custody of child?' " *Id.* ¶ 180.

- "FCS has a policy, custom and practice of discriminating against males when making custody determinations in these situations." *Id.* ¶ 181.
- "The City has established a policy to give deference to the domestic violence allegations of women despite the obvious and negative effects on the rights of others, such as an accused. This biased policy permeates the culture and policies of the FCS and the other agencies under the City's control." *Id.* ¶ 182.

Claim Ten: DISMISSED.

Claim Eleven: DISMISSED.

### 2. The Motion to Dismiss

In their Motion to Dismiss, Defendants seek dismissal of all of the claims asserted in the Second Amended Complaint.[5] First, they contend the entire action is barred under the *Rooker-Feldman* doctrine, observing that "the lawsuit is predicated on and inextricably intertwined with three state court orders and the state court's juvenile, dependency procedures." Motion to Dismiss at 8-11. In particular, Defendants contend Plaintiff's claims amount to an appeal of the TRO and the EPO.[6] *Id.* at 8-9. Defendants also cite the California statutes and procedures that govern child custody determinations. *Id.* at 9-11.

Next, Defendants assert that Plaintiff's claims are barred under the *Noerr-Pennington* doctrine and California's litigation privilege, which they contend apply because "Plaintiff's theory of liability challenges Defendants' efforts to seek the involvement of CPS, efforts to obtain judicial relief in the form of protective orders (the TRO, EPO and permanent injunction), and [Candice's] motives to contact police allegedly for the purpose of 'using it' in the subsequent divorce and custody proceedings." *Id.*[7]

---

[5] Because Plaintiff has now dropped Claims Eight, Ten and Eleven, the Court here summarizes only the challenges Defendants assert to the remaining claims.

[6] Defendants do not clearly identify the third order referenced in the Motion; it may be the permanent injunction that was ultimately issued by the Family Court giving Ayush sole custody of A.K.

[7] Defendants do not cite to a specific allegation in the Second Amended Complaint in support of this contention and the Court finds no allegation therein that Candice called the police with the intent of gaining the upper hand in the subsequent divorce and custody proceedings. Plaintiff does allege that "[t]he police report and arrest provided Candice with a valuable tool to utilize during subsequent family court/custody matters" SAC ¶ 19. He further alleges that "[i]t is regrettable

Defendants further assert that all of Plaintiff's claims fail to state a claim because the facts establish that the officers had probable cause to arrest Ayush, as a matter of law, and furthermore, they are entitled to qualified immunity. *Id.* at 13-18. In addition, Defendants contend they are entitled to absolute judicial and quasi-judicial immunity because they were "carrying out judicial orders," namely, the TRO and/or the EPO. *Id.* at 16-17.

Defendants also contend Plaintiff's claims that invoke the Fourteenth Amendment (Claims Four, Five, Six and Seven) fail to state a claim for a laundry list of reasons. *Id.* at 18-20. Although Defendants' arguments are difficult to follow as they do not clearly identify the specific claims that are the target of each challenge, they appear to argue that: 1) the malicious prosecution claim (Claim Five) and the failure to intervene claim (Claim Seven) fail because such claims are "cognizable only if the abuse of power 'shocks the conscience' and 'violates the decencies of civilized conduct[ ]'" and Plaintiff's allegations do not rise to that level; 2) Plaintiff's claim based on "gender, nationality and racial discrimination" (apparently aimed at Claim Four) fails because "the litany of statements [in the Second Amended Complaint] has nothing to do with race, gender or discrimination, or show animus towards males of Indian descent" and the fact that "Ayush successfully obtained a TRO, and the same officers serv[ed] it and [did] not allow[ ] AK to go with [Candice] [,] disprov[es] the inference of discrimination[;]"[8] 3) the malicious prosecution

_____

that Ayush and A.K. (the victims of domestic violence) were harmed not only during August of 2023 but over a much longer period due to the ammunition SFPD provided to Candice, which allowed her to temporarily and unjustly impeach Ayush's character in Family court." *Id.*

[8] Defendants also include the following argument in their Motion:

> In the 1970s, when African Americans, women, Jewish and Catholic judges were appointed, litigants moved to disqualify them, arguing they could not be unbiased based on the color of their skin, gender and/or religion. "If such arguments are asserted in good faith and sincerity, they nevertheless represent an almost subconscious expression of their expectation of the deportment of blacks and, more specifically, of black judges **[or, here, City mayors or leadership].** If America is going to have a total rendezvous with justice so that there can be full equality for blacks, other minorities, and women, it is essential that the 'instinct' for double standards be completely exposed and hopefully, through analysis, those elements of irrationality can be ultimately eradicated." *Com. of Pa. v. Loc. Union 542, Int'l Union of Operating Eng'rs*, 388 F. Supp. 155, 181–82 (E.D. Pa. 1974) (noting it was odd to suggest a white male would have no bias, while presuming such for everyone else), approved *In re Complaint of Jud. Misconduct*, 816 F.3d 1266, 1268 (9th Cir. 2016); *United States v. Odeh*, No. 13-CR-20772, 2014 WL 3767808, at *3–4 (E.D. Mich. July 31, 2014)(rejecting that a Catholic judge could not fairly adjudicate over a case because of bias); *Marcavage v. Bd. of Trs. of Temple Univ. of Commonwealth Sys. of Higher Educ.*,

16

claim (Claim Five) fails for the additional reason that Plaintiff's allegations make clear that he was not actually prosecuted after the arrest; and 4) as to the failure to intervene claim (Claim Seven), Defendants "are aware only of 'failure to intercede' claims applying in excessive force cases." *Id.*

Defendants argue that the *Monell* claims fail to state a claim because Plaintiff does not establish the violation of any constitutional right, does not identify any unconstitutional policy – because "[a] single violation and written policies that support non-discrimination disprove a uniform and pervasive custom that is the moving force behind the constitutional violation" – and "[t]here is also no allegation that someone with 'final policy-making authority' committed or ratified conduct that caused the alleged constitutional violation." *Id.* at 20-22. To the extent Plaintiff alleges that Sargeant Canning ratified the unconstitutional arrest, Defendants argue that this does not establish ratification by the City because there is no allegation that Sargeant Canning had " 'final policy making authority,' and the factual allegations state the opposite: the officers 'were on their own.' " *Id.*

### A.    Legal Standards Under Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

232 F. App'x 79, 83–84 (3d Cir. 2007) (rejecting "race-based tactic"); *Blank v. Sullivan & Cromwell*, 418 F. Supp. 1, 4 (S.D.N.Y. 1975) (a female judge is capable of adjudicating a matter fairly). A similar pernicious view buoys this lawsuit.

Motion at 19-20 (emphasis added). This argument appears to be aimed at an allegation in the First Amended Complaint ("FAC") referencing San Francisco Mayor London Breed, *see* dkt. no. 18 (FAC), ¶ 175. That allegation was removed from the Second Amended Complaint. Therefore, the Court disregards this argument.

17

non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 570).

## B. *Rooker-Feldman* Doctrine

"Federal district courts may exercise only original jurisdiction; they may not exercise appellate jurisdiction over state court decisions." *Dubinka v. Judges of Superior Ct. of State of Cal. for Cnty. of Los Angeles*, 23 F.3d 218, 221 (9th Cir. 1994) (citing *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16 (1923)). "This rule arises from the interplay of two jurisdictional statutes: 28 U.S.C. § 1331, which grants district courts original jurisdiction over 'civil actions arising under' federal law, and 28 U.S.C. § 1257, which grants the Supreme Court the right to review 'final judgments . . . rendered by the highest court of a State.'" *Id.* Moreover, it applies "even when the state court judgment is not made by the highest state court," *id.* (citing *Worldwide Church of God v. McNair*, 805 F.2d 888, 893 n. 3 (9th Cir.1986)), "and when the challenge to the state court's actions involves federal constitutional issues." *Id.* (citing *Feldman*, 460 U.S. at 484–86).

To determine whether a civil rights action is an impermissible attack on a state court's ruling under the *Rooker-Feldman* doctrine, courts consider whether the plaintiff's federal claims are "inextricably intertwined" with the state court's ruling. *Id.* (citing *Feldman* 460 U.S. at 482 n. 16). "Courts have generally concluded that claims are inextricably intertwined when the district court must scrutinize both the challenged rule and the state court's application of that rule." *Id.* (citations omitted). "Put another way, a 'federal claim is inextricably intertwined with the state court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.' " *Lynn v. Friedenthal*, No. CV 09-08717-PSG VBK, 2011 WL 6960823, at *6 (C.D. Cal. Dec. 2, 2011), report and recommendation adopted, No. CV 09-08717-PSG VBK, 2012 WL 32576 (C.D. Cal. Jan. 6, 2012) (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring)).

The mere fact that a plaintiff's civil rights claims arise in a "judicial context" does not mean that those claims are "inextricably intertwined" with a state court judgment. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1143 (9th Cir. 2021). Thus, for example, in *Benavidez* the court found that the *Rooker-Feldman* doctrine did not apply to constitutional claims asserted under 42 U.S.C. § 1983 against county social workers, among others, who had obtained an order from the juvenile court to conduct medical examinations of the plaintiffs' children while they were in foster care but had not advised the parents of their right to be present or sought their consent before the examinations occurred. 993 F.3d at 1140, 1143. The court explained:

> The Benavidezes' claims are not a de facto appeal from the juvenile court Orders. Instead, they allege that the misrepresentations by [the social workers] and further inaction by those social workers and other County employees resulted in violations of their constitutional rights. . . . [T]he Benavidezes' claims are based on section 1983, which provides a statutory cause of action where state officials acting under color of law violate constitutional rights. 42 U.S.C. § 1983. Despite the judicial context and intermediate step of the juvenile court Orders, the Benavidezes' claims do not seek relief from or reversal of the juvenile court's Orders. Therefore, the *Rooker-Feldman* doctrine does not serve as a jurisdictional bar to their claims here.
>
> The County fails to acknowledge that the Benavidezes claim injury based on the alleged misrepresentation by [the social workers] that caused the juvenile court to issue the Orders which authorized the medical examinations. In fact, the Benavidezes challenge a legal wrong by [the social workers] preceding the issuance of the Orders,

19

and the County's custom or failure to train to prevent against unconstitutional medical examinations. As the district court noted, the "alleged legal wrongs by [the social workers] cannot avoid scrutiny because they were successful in deceiving the juvenile court." Thus, the County is incorrect that the *Rooker-Feldman* doctrine bars federal subject matter jurisdiction.

*Id.* at 1143.

Here, Defendants make vague references to the TRO that gave Ayush sole custody of A.K. (which Defendants allegedly ignored), the permanent injunction that Ayush eventually obtained from the Family Court (months or years after the relevant events in this case) again awarding him sole custody of A.K., and the EPO that the officers obtained after Ayush had been arrested and A.K. had been taken into CPS custody. They also talk generally about state law and procedures governing child custody determinations, suggesting that somehow these bring the claims against Canziani within the ambit of the *Rooker-Feldman* doctrine. However, they don't explain how Plaintiff's claims are "inextricably intertwined" with any specific state court judgment. The Court finds that they are not.

First, it is obvious that Plaintiff is not seeking relief from the TRO or the permanent injunction given that both were decided in his favor. Furthermore, even if a ruling on Plaintiff's constitutional claims might indicate that the EPO was issued in error, the EPO expired long ago and the Plaintiff does not ask the Court to reverse or vacate it. Rather than complaining of any injury arising from any state court judicial proceedings, Plaintiff's claims in this case, like the claims in *Benavidez*, "are based on section 1983, which provides a statutory cause of action where state officials acting under color of law violate constitutional rights[,]" and are aimed at conduct that occurred *before* the EPO was issued. *Id.* In addition, Plaintiff alleges that the EPO "was based on an entirely erroneous and contrived affidavit in support and was presented ex parte." SAC ¶ 57. Thus, even if his claims did seek to set aside the EPO, they would not be barred by the *Rooker-Feldman* doctrine. *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1141 (9th Cir. 2004) ("It has long been the law that a plaintiff in federal court can seek to set aside a state court judgment obtained through extrinsic fraud.").

Therefore, the *Rooker-Feldman* doctrine does not serve as a jurisdictional bar to the claims asserted in the Second Amended Complaint.

20

### C.    *Noerr-Pennington* Doctrine[9]

"The *Noerr–Pennington* doctrine derives from the Petition Clause of the First Amendment and provides that 'those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct.' " *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643–44 (9th Cir. 2009) (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006)).  Although the doctrine first arose in the antitrust context, "[t]he Supreme Court has since held that *Noerr–Pennington* principles 'apply with full force in other statutory contexts' outside antitrust." *Id.* at 644 (quoting *Sosa*, 437 F.3d at 930).  To determine whether the doctrine applies, courts apply a three-part test in which they: "(1) identify whether the lawsuit imposes a burden on petitioning rights, (2) decide whether the alleged activities constitute protected petitioning activity, and (3) analyze whether the statutes at issue may be construed to preclude that burden on the protected petitioning activity." *Id.* (citing *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 530-533, 535-537 (2002)).  However, the doctrine does not apply if the defendant has made "intentional misrepresentations to the court[,]" thus "depriv[ing]] the litigation of its legitimacy." *Id.* (citing *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998)).

Defendants' argument has no merit.  Were Plaintiff to have brought claims against Candice based on her summoning the police, those claims likely would be barred under the *Noerr-Pennington* doctrine. *See Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673 F.2d 1045, 1060 (9th Cir. 1982) (holding that an "approach to the police for aid" is protected under the *Norr-Pennington* doctrine); *Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 793 F.3d 85, 90 (D.C. Cir. 2015) (holding that "the act of summoning the police to enforce state trespass law is a direct petition to government subject to protection under the *Noerr–Pennington* doctrine.").  Likewise, if he were suing the officers for seeking an EPO after his arrest, that petitioning activity also likely would be protected. *See B&G Foods N. Am., Inc. v. Embry,* 29 F.4th 527, 536 (9th Cir. 2022) (observing that the *Noerr-Pennington* doctrine has been "extended . . .  to litigation activities by

---

[9] In the Motion, Defendants also rely on the California litigation privilege in connection with Claims Eight and Eleven, which were asserted under state law.  As those claims have been dismissed the Court addresses only the *Noerr-Pennington* doctrine here.

government actors.") (citations omitted). However, Defendants have cited no authority that suggests that the type of constitutional violations alleged here are protected under *Noerr-Pennington* simply because the police were called to the scene by a citizen who was seeking aid from the police. Nor have they cited any case to support their contention that the officers were "petitioning" CPS within the meaning of the doctrine simply because they called CPS to obtain guidance as to whether A.K. should be detained.

The Court also rejects Defendants' reliance on *Edwards v. City of San Diego*, No. 24-cv-01118-JAH-SBC, 2025 WL 2616964 (S.D. Cal. Sept. 10, 2025), which they contend involved a "nearly identical fact pattern." Motion at 12. Defendants correctly state that in that case, the court held that all three elements required to establish immunity under *Noerr-Pennington* were met "because plaintiff sought to assert liability for communications that were 'incidental to the divorce and restraining order proceedings.'" *Id.* They do not acknowledge, however, that in that case, the plaintiff husband asserted claims against his wife's attorneys based on their communications with police officers seeking assistance in serving a domestic violence restraining order ("DVRO") obtained by the wife on the husband. 2025 WL 2616964, at *4. In that context, the court explained that the plaintiff sought to hold the attorney defendants "liable for their communications to the SDPD sergeant regarding the DVRO[,]" that the attorney defendants' "communications were incidental to the divorce and restraining order proceedings[,]" and that the plaintiff's "theory of liability directly challenge[d] Defendants' efforts to obtain judicial relief in the form of protective orders and seeks to impose civil liability based on the content and consequences of those filings." *Id.* Therefore, the court concluded, the plaintiff's action would "prevent Attorney Defendants from participating in the restraining order proceedings and . . . penalize them for exercising their petition rights." *Id.* In contrast to *Edwards*, Plaintiff here does not sue any defendant for seeking the assistance of the SFPD or CPS in connection with a state court proceeding.[10]

---

[10] While it is alleged in the Second Amended Complaint that Ayush asked the officers to serve Candice with the TRO and the officers did so, there is no suggestion in the complaint that their actions with respect to serving the TRO are the basis of any of Ayush's claims in this case.

22

*United States District Court*
*Northern District of California*

Accordingly, the Court rejects Defendants' assertion that Plaintiff's claims are barred under the *Noerr-Penington* doctrine.

### D.    Sufficiency of Allegations

#### 1.    Claims One Through Three (Fourth Amendment Claims) (Ayush)

##### a.    Probable Cause

Defendants ask the Court to dismiss Claims One through Three on the grounds that the Officers had probable cause to arrest Ayush, as a matter of law, because "[v]isible signs of injury, combined with a victim's statement, are sufficient to establish probable cause." Reply at 6 (citing *United States v. Lowe*, 676 F. App'x 728, 732 (9th Cir. 2017); *Murray v. City of Carlsbad*, No. 08CV2121 BTM, 2010 WL 2839477, at *7 (S.D. Cal. July 19, 2010); *Stutes v. Parrish*, No. 14-CV-02016-LHK, 2015 WL 8770720, at *4 (N.D. Cal. Dec. 15, 2015)). Plaintiff counters that he has adequately alleged a lack of probable cause by alleging that the Officers ignored exculpatory evidence.  Opposition at 18. The Court concludes that the existence of probable cause presents questions of fact that are not appropriately decided at the pleading stage of the case.

"Probable cause exists when, 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability' that a crime was committed." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)). "Although an officer may not ignore exculpatory evidence that would negate a finding of probable cause, *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003), the officer may assess the credibility of evidence when determining whether to arrest a suspect." *Stutes v. Parrish*, No. 14-CV-02016-LHK, 2015 WL 8770720, at *4 (N.D. Cal. Dec. 15, 2015) (citing *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015)). Generally, the existence of probable cause is a question for the jury.  *Gasho*, 39 F.3d at 1428.

Defendants are correct that visible injury combined with a victim's statement *may* be sufficient to establish probable cause to arrest for domestic violence under California Penal Code section 273.5.  That statute makes it a crime to "willfully inflict[ ] corporal injury resulting in a traumatic condition upon a victim" who is, *inter alia*, the offender's "spouse," a "cohabitant" or

United States District Court
Northern District of California

"someone with whom the offender has, or previously had, an engagement or dating relationship." In *Stutes v. Parrish*, for example, the court granted summary judgment in favor of the defendant officers on the basis that there was probable cause to arrest the plaintiff where there was undisputed evidence that the defendants knew that: 1) the plaintiff and the victim had been in a dating relationship; 2) the victim had "bruises on her arms, buttocks, and thighs" and told the officers that the plaintiff had physically assaulted her; and 3) the victim "was visibly upset and appeared in fear for her safety" during her interview with one of the officers. 2015 WL 8770720, at *4. The court found that these facts and circumstances were sufficient to establish probable cause, noting that "[b]ruising is a 'traumatic condition' for purposes of [Cal. Penal Code § 273.5].'" *Id.* at *4 (citing *United States v. Hall*, 419 F.3d 980, 986 (9th Cir. 2005)). It further found that to the extent the plaintiff had denied physically assaulting the victim, the officers did not ignore this exculpatory evidence because they documented it in the incident report. *Id.* at 4 (citing *Yousefian*, 779 F.3d at 1014 (holding that arresting officer did not ignore suspect's exculpatory statements because the arresting officer documented the exculpatory statements in the officer's report)).

In *Murray v. City of Carlsbad*, the court granted summary judgment in favor of the defendant officers, finding probable cause to arrest the plaintiff for domestic violence based on a detailed account from the victim of being choked and thrown to the floor by the plaintiff and then forcibly removed by the plaintiff from his house two times. 2010 WL 2839477, at *4 (S.D. Cal. July 19, 2010). The plaintiff told the officers he had removed the victim from his home but did not state that he had choked her, which the court observed might "arguably [give rise to] a factual dispute regarding [the victim's] claim that [the plaintiff] choked her." *Id.* Nonetheless, the court found that the undisputed evidence established probable cause because: 1) the arresting officer "observed redness around [the victim's] neck in addition to an injury on her left arm"; 2) the plaintiff "provided no specific explanation for [the victim's] neck injury;" and 3) the victim's account was corroborated by "surrounding circumstances", namely, the officer's observation that the victim "appeared upset, nervous [and] distraught as a victim[.]" *Id.*

The court in *Murray* went on to reject the plaintiff's argument that the victim's injuries

24

were not severe enough to constitute "corporal injury" under section 273.5 because she "suffered nothing more than 'soreness and tenderness[.]'" *Id.* at *6 (citing *People v. Abrego*, 21 Cal.App.4th 133, 138 (1993)). The court observed that "it has been held that a red mark, much like the one [the arresting officer] observed on [the victim's neck], is sufficient to constitute a traumatic condition under § 273.5." *Id.* (citing *People v. Wilkins*, 14 Cal.App.4th 761, 771 (1993) (finding trial court properly denied motion to suppress evidence obtained as the result of warrantless entry into plaintiff's home where officers had probable cause for arrest under § 273.5 based in part on "redness about [the victim's] face and nose" because "section 273.5 is violated when the defendant inflicts even minor injury"); *Harrington v. City of Napa*, 2005 WL 1656883, at * 6 (N.D.Cal.2005) (finding on summary judgment that redness on skin where victim was allegedly hit with a telephone met definition of "traumatic condition")).

The cases Defendants cite, however, were decided on summary judgment and not on the pleadings. Furthermore, whereas the circumstances in the cases discussed above were relatively clearcut, the circumstances alleged here are more complicated, with, on the one hand, a victim claiming violent assault, and on the other hand, information of which the Officers were aware pointing to the conclusion that the victim was being untruthful, including about whether she had been assaulted at all. Nothing in the cases cited by Defendants supports the conclusion that in the face of such complicated alleged circumstance it is appropriate to decide at the pleading stage of the cases that there was probable cause to arrest Ayush as a matter of law. Therefore, the Court rejects Defendants' argument that Claims One through Three should be dismissed on this ground.

### b. Qualified Immunity of the Officers

While probable cause determinations are generally for the jury to decide, "when evaluating qualified immunity . . . the threshold 'determination of whether the facts alleged could support a reasonable belief in the existence of probable cause . . . is [ ] a question of law to be determined by the court." *Johnson v. Barr*, 79 F.4th 996, 1003 (9th Cir. 2023) (quoting *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

25

United States District Court
Northern District of California

known.' " *Pearson v. Callahan*555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials [will] be resolved prior to discovery." *Id.* (internal quotations and citations omitted). Thus, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* (internal quotations and citations omitted).

Determination of qualified immunity involves a two-prong inquiry whereby courts consider: 1) whether the facts alleged constitute a constitutional violation; and 2) and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). While the Court in *Saucier* mandated that the inquiry must proceed in this order, the Court in *Pearson* modified that rule, concluding that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 232. Here, the Court begins by addressing whether Plaintiff has adequately alleged a constitutional violation that was "clearly established" at the time of the relevant events such that Defendants are not entitled to qualified immunity. The Court finds, at least as a matter of pleading, that he has.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Because the circumstances here involved an accusation of domestic violence, the Court must take into consideration the Ninth Circuit authority emphasizing that "domestic disputes present a responding officer with situations involving great potential danger to occupants of the household[]" and that "[i]f the officer hesitates to act, his hesitancy may lead to the occurrence of otherwise preventable violence." *Peng v. Mei Chin Penghu*, 335 F.3d 970, 977 (9th Cir. 2003). Nonetheless, there can be no doubt that where exculpatory information of which the arresting officers were aware establishes that the individual did not commit *any* act of domestic violence, there is no probable cause to arrest for domestic violence. This proposition is so obvious that Plaintiff need not point to any case involving similar

26

facts (something neither side has been able to do) to show that the alleged constitutional violation was well-established. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (where constitutional violation was obvious, earlier case with similar facts was not necessary to put defendants on notice that their conduct violated established law).

By extension, the Ninth Circuit has held that "[a]n officer is not entitled to a qualified immunity defense . . . where exculpatory evidence is ignored that would negate a finding of probable cause." *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003). Thus, in that case the court found that the district court had improperly denied leave to amend where the plaintiffs might have been able to allege viable constitutional claims based on allegations that the defendants ignored potentially exculpatory evidence by declining to interview a material witness while they were still investigating whether there was probable cause to arrest. *Id.* at 1033.

Here, Plaintiff alleges that Officer Hung, Sargeant Canning and Canziani all were presented with potentially exculpatory information indicating that Candice was being untruthful about having been assaulted by Ayush but they simply ignored it. Drawing all reasonable inferences in Plaintiff's favor, as the Court is required to do at the pleading stage of the case, that is sufficient to support an inference that these defendants are not entitled to qualified immunity as to Ayush's Fourth Amendment claims. Of course, Defendants may revisit this question on summary judgment, after the factual record has been developed.

Defendants' argument that they did, in fact, take the exculpatory evidence cited by Plaintiff into account in making their probable cause determination and that they were simply making a credibility determination – which cannot be used to defeat probable cause – is not persuasive at this stage of the case. Again, all reasonable inferences must be drawn in Plaintiff's favor and one reasonable inference is that Defendants dismissed the exculpatory evidence out of hand, not considering it at all rather than factoring it in to a credibility determination based on all the circumstances. While further development of the facts may (or may not) support Defendants' position, a finding that Officer Hung, Sargeant Canning and Canziani took the exculpatory evidence into consideration in making their probable cause determination rather than ignoring it is premature.

c.   Qualified Immunity of Canziani

In Claims One through Three, Canziani is alleged to have violated Ayush and A.K.'s constitutional rights in two respects: 1) by encouraging the Officers to arrest Ayush without probable cause; and 2) by taking custody of A.K. and placing him in foster care rather than placing him in the care of the individual Ayush designated.  As to the former theory, the same qualified immunity analysis applies to Canziani as to the Officers and therefore, the Court finds for the reasons stated above that Plaintiff's allegations are sufficient, at this early stage of the case, to defeat qualified immunity as to Canziani with respect to Ayush's arrest.   As to the second theory, Defendants suggest that Canziani is entitled to qualified immunity because she was following state law when she instructed the Officers to take custody of A.K.[11] This argument is unpersuasive.

Defendants cite two cases in support of this argument, *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994) and *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999). In *Grossman*, the  plaintiff had been arrested under a municipal code provision that the court found violated the First Amendment.  33 F.3d at 1208.  The court therefore found that the plaintiff was entitled to recover damages from the municipality.  *Id.* Nonetheless, the court went on to find that the arresting officer was entitled to qualified immunity because he was relying on a duly-enacted statute and reasonably believed that his conduct was constitutional.  *Id.*  at 1210.  The court explained the standard it applied as follows:

> [W]hen a city council has duly enacted an ordinance, police officers on the street are ordinarily entitled to rely on the assumption that the council members have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority. Courts have accordingly held that the existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional. *See, e.g., Evers v. County of Custer*, 745 F.2d 1196, 1203 (9th Cir.1984); *Malachowski v. City of Keene*, 787 F.2d

---

[11] Defendants assert that Plaintiff's claims against these defendants "are not cognizable" because Canziani and/or FPS and/or CPS were following state law. *See* Motion at 16 (citing *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994); *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999).  Neither of these cases, however, addresses the legal standards governing when it is unconstitutional to take custody of a child under circumstances such as those alleged here. Rather, they address the circumstances under which a defendant may be entitled to qualified immunity based on the enforcement of a state law.  Therefore, the Court construes this argument to be aimed at qualified immunity.

28

704, 713–14 (1st Cir.), cert. denied, 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).

As with most legal matters, there are no absolutes here. On the one hand, an officer who acts in reliance on a duly-enacted statute or ordinance is ordinarily entitled to qualified immunity On the other, as historical events such as the Holocaust and the My Lai massacre demonstrate, individuals cannot always be held immune for the results of their official conduct simply because they were enforcing policies or orders promulgated by those with superior authority. Where a statute authorizes official conduct which is patently violative of fundamental constitutional principles, an officer who enforces that statute is not entitled to qualified immunity. Similarly, an officer who unlawfully enforces an ordinance in a particularly egregious manner, or in a manner which a reasonable officer would recognize exceeds the bounds of the ordinance, will not be entitled to immunity even if there is no clear case law declaring the ordinance or the officer's particular conduct unconstitutional. *See Chew*, 27 at 1449–50. In the end, however, an officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability.

33 F.3d 1200 at 1209–10.

Defendants do not address this nuanced standard at all, much less establish that Canziani is entitled to qualified immunity under it. Rather, their summary of the relevant state laws is incomplete and they have not addressed whether Canziani's reliance on the laws they cite was reasonable. In particular, Defendants contend Canziani was following state law with regard to taking custody of A.K. (instead of allowing Plaintiff's friend to care for A.K. when his father was arrested) because he was acting in accordance with California's Welfare and Institutions Code section 360, *et seq*, which "govern[s] a child's welfare where parents cannot care for the child, because a parent is arrested or restraining orders exist." Motion at 9-10. According to Defendants, "because both parents had restraining orders and Ayush was arrested and detained in jail, sub-section (g) of WIC Section 360 required CPS to take care of the child." Motion at 10. Section 360 has no subsection (g) however.

Next, Defendants contend that "[a]lthough CPS considers a parent's request for placement, the social worker is the ultimate decider, and must first conduct a visit to the home, interview the candidate, conduct a criminal records check, and obtain a child abuse index from the authorities." *Id.* (citing WIC § 361.4, subds. (a)–(c); *In re M.*L., 205 Cal. App. 4th 210, 223 (2012) (reversing trial court's overruling of CPS's revocation of temporary placement after discovering criminal

29

background)).   Section 361.4 relates to the "Emergency" placement of a child, however, whereas Plaintiff alleges that all of the circumstances indicated that there was no emergency because there was no evidence A.K. was in any danger or could not be entrusted to the care of a family friend, as requested by the parent with legal custody of A.K.

Even assuming that the situation constituted an emergency under Section 361.4, there are other statutory requirements that Plaintiff contends were ignored.  In particular, WIC § 309(d)(1) provides that if  "a nonrelative extended family member . . . is available and requests emergency placement of the child pending the detention hearing . . .  the county welfare department shall initiate an assessment of the relative's or nonrelative extended family member's suitability for emergency placement pursuant to Section 361.4."  WIC § 309(d)(1).  Furthermore, WIC § 361.4(b)(1), provides that "[i]f CLETS information obtained pursuant to paragraph (2) of subdivision (a) indicates that the person has no criminal record, the child may be placed in the home on an emergency basis."  *Id.*  And WIC § 309(a), provides that "[u]pon delivery to the social worker of a child who has been taken into temporary custody under this article, the social worker shall *immediately* investigate the circumstances of the child and the facts surrounding the child's being taken into custody and attempt to maintain the child with the child's family through the provision of services."  WIC § 309(a) (emphasis added).

Here, the gravamen of Plaintiff's first three claims as they relate to the seizure of A.K. is that the Officers acted improperly by failing to grant Mr. Gill custody of A.K. at the scene of the arrest and that the Officers did so upon the instructions of Canziani. Plaintiff further alleges that "FCS officers failed to perform a reasonable investigation prior to taking A.K. into state custody," SAC ¶ 61, that "SFPD and FCS failed to make any effort to place A.K. with the person designated by his sole legal custodian," *id.* ¶ 63, and that A.K. was held for over a week in foster homes of strangers, *id.* ¶ 64.  Defendants have pointed to only a handful of provisions and failed to address in a meaningful way why Canziani reasonably believed based on these statutory provisions that it was constitutional to take A.K. into custody rather than leave him with Mr. Gill as Ayush requested.  Given that the record has yet to be developed on questions such as whether Mr. Gill was ever assessed for suitability, whether FPS ran a CLETS search of his background,

and why A.K. was left in foster care for more than a week even though his father was in custody only three days, the Court concludes that a finding of qualified immunity as to Canziani based on her adherence to state law is unwarranted.  Therefore, the Court rejects this qualified immunity argument to the extent that Defendants raised it.[12]

### 2.  Claims One through Three (Fourth Amendment Claims) (A.K.)

Ayush asserts Claims One through Three not only based on his own seizure but also based on his own seizure but also based on A.K.'s seizure.  Defendants have not, however, meaningfully addressed these claims or challenged their sufficiency.  Therefore, the Court finds that Claims one through Three survive to the extent that they are asserted on A.K.'s behalf.[13]

### 3.  Claim Four (Violations of Equal Protection) (Ayush)

In Claim Four, Plaintiff alleges that his right to Equal Protection under the Fourteenth Amendment was violated because the Officers' "perception of the situation" was "colored" by the fact that he is "male, an immigrant, and of a minority race[,]" causing them to arrest him without probable cause.  SAC ¶¶ 99-103.  The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439

---

[12] The Court also rejects Defendants' suggestion that Canziani may be entitled to absolute immunity on the grounds that "CPS is afforded 'absolute immunity when they make discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents' and quasi-judicial immunity related to placement of children with particular foster parents." Motion at 16-17 (citing *Miller v. Gammie*, 335 F.3d 889, 898-99 (9th Cir. 2003) (qualified immunity applies for CPS social workers' "decisions and recommendations as to the particular home where a child is to go or as to the particular foster parents who are to provide care")). *Miller* involved decisions and recommendations of social workers in the context of judicial dependency proceedings and there is no allegation here that there were any dependency proceedings regarding A.K.'s placement in the week he was separated from his father.

[13] The Court notes that familial separation claims are treated as Fourteenth Amendment violations when asserted by a parent but are treated as Fourth Amendment claims when asserted by children who have been separated from their families; however, the same analysis applies to both claims. *See Doe v. Lebbos*, 348 F.3d 820, 826 n. 9 (9th Cir. 2003), overruled on other grounds by *Beltran v. Santa Clara Cnty.*, 514 F.3d 906 (9th Cir. 2008)).  In particular, whether under the Fourteenth Amendment or the Fourth Amendment, the key inquiry is whether there was at the time the child was removed from their family "reasonable cause to believe that the child [was] in imminent danger of serious bodily injury and . . . the scope of the intrusion [was] reasonably necessary to avert that specific injury."  *Id.*  (citing *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000)).  Thus, the adequacy of A.K.'s Fourth Amendment claims turns on a different analysis from Ayush's Fourth Amendment claims and does not depend on whether the Officers had probable cause to arrest Ayush.

31

(1985). To state a claim for denial of equal protection, Plaintiff must show that he was treated differently from persons similarly situated or that Defendants acted with an intent to discriminate against him based on his membership in a protected class. *See Washington v. Davis*, 426 U.S. 229, 239–40 (1976); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Plaintiff offers merely conclusory allegations in the SAC, speculating that the Officers and Canziani were motivated by discriminatory animus.  Even drawing all reasonable inferences in favor of Plaintiff, he has not plausibly alleged that any defendant was motivated by discriminatory intent. See *Doe v. Cnty. of San Mateo*, No. C 07-05596 SI, 2009 WL 735149, at *11 (N.D. Cal. Mar. 19, 2009) (granting motion to dismiss Equal Protection claim where plaintiff alleged that police officers took domestic abuse cases less seriously than other assault cases because of animus towards women without alleging specific facts sufficient to show such animus). Therefore, the Court dismisses Plaintiff's Equal Protection claim as to Ayush with leave to amend.

### 4. Claim Four (Violations of Equal Protection)(A.K.)

In the SAC, Plaintiff apparently seeks to assert a separate equal protection claim on behalf of A.K., alleging that "the fact that A.K. is male and of a minority race caused and otherwise colored the officer's perception of the situation."  There are no factual allegations in the SAC that give rise to a plausible inference that any defendants' conduct was motivated by animus based on A.K.'s gender or race.  Like the equal protection claim asserted by Ayush, this claim is based entirely on speculation. Therefore, the Court dismisses this claim with leave to amend.

### 5. Claim Five (Malicious Prosecution)(Ayush)[14]

Defendants contend Plaintiff fails to state a claim for malicious prosecution because he alleges that "the charges were summarily rejected by the District Attorney[,]" that is, he was not prosecuted.  Motion at 20 (citing SAC at p. 2); *see also* SAC ¶ 65 ("Ayush's charges were promptly dismissed when the district attorney declined to file charges due to a complete lack of evidence.").  Plaintiff counters that the claim survives because "Officer Hung initiated criminal charges against Anush."  Opposition at 18.   Defendants are correct.   A claim for malicious

---

[14] This claim, on its face, is asserted only by Ayush.  It does not include allegations that could be construed as an attempt to assert a malicious prosecution claim on A.K.'s behalf.

United States District Court
Northern District of California

prosecution is distinct from a false arrest claim in that the former is based on the abuse of the legal process and thus does not arise until a criminal complaint is filed. *See Beck v. City of Upland*, 527 F.3d 853, 861 n. 7 (9th Cir. 2008); *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1204–06 (9th Cir.2003) (distinguishing between the two torts at common law). Plaintiff cites to no authority supporting his assertion that merely referring the case to a prosecutor is enough to give rise to a malicious prosecution claim. Therefore, the Court finds that Plaintiff fails to state a claim as to Claim Five. The Court dismisses Claim Five with prejudice because Plaintiff has pointed to no additional factual allegations that could save this claim.

### 6. Claim Six (Ayush) (Unlawful Separation/Interference with Familial Relationship)

In Claim Six, Plaintiff asserts that his Fourteenth Amendment procedural[15] and substantive due process rights were violated when he was separated from A.K. because the Officers ignored the TRO giving Ayush custody of A.K. and refused to transfer custody of A.K. to the caregiver designated by Plaintiff even though there was no "reasonable cause . . . to believe that A.K. was in imminent danger of serious bodily injury" and "[t]here was never reasonable cause to believe that Ayush's appointed caregiver was unable to care for A.K." SAC ¶¶ 113-118. He further asserts that "[t]he scope of any justifiable action that may have been warranted in regard to the separation of A.K. and Ayush was far exceeded by officers of both the SFPD and employees of CPS when they seized A.K. and put him into state custody for a week." *Id.* ¶ 119.

"Government officials are required to obtain prior judicial authorization before intruding on a parent's custody of [their] child unless they possess information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106–07 (9th Cir. 2001) (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000) (citing *Mincey v. Arizona*, 437 U.S. 385, 393 (1978))). Thus, for example, in *Kulya v. City & Cnty. of San Francisco,* the Court

---

[15] At oral argument, Plaintiff stipulated that he has dropped the claim to the extent it is based on violation of his procedural due process right and is pursuing this claim only as to violation of the right to substantive due process.

found on summary judgment that the familial separation claim failed under *Mabe* because the undisputed facts established that exigent circumstances existed and that "there was reasonable cause to believe the child faced an immediate threat of abuse" if he was not removed from the home.  No. C 06-06539 JSW, 2008 WL 4415116, at *7 (N.D. Cal. Sept. 26, 2008).  There, the court cited the following undisputed facts of which the social workers were aware in support of this conclusion:

> (1) the child had repeatedly told the police officers and paramedics the same, consistent story that his father had abused him; (2) there were bruises noted on the child's body; (3) the father had been arrested for the alleged offense for felony abuse of the child which arrest was highly unusual; (4) the father had a prior substantiated case of child abuse on his record; and (5) [the social worker defendant] had asked the father, through speaking with his attorney, whether he preferred the child remain with the mother pending a more thorough investigation or if he would prefer to have the child sheltered, and the father opted for removal.

*Id.* at *6. Here, in contrast to *Kulya*, the SAC includes extensive allegations attesting that there was no emergency situation that warranted taking custody of A.K. rather than allowing him to be cared for by the family friend designated by Ayush, A.K.'s legal guardian. Therefore, Defendants have not established that this claim fails as a matter of law.[16]

### 7. Claim Six (Unlawful Separation/Interference with Familial Relationship) (A.K.)

The SAC contains lengthy allegations relating to the violation of A.K.'s rights on this claim.  *See* SAC ¶¶ 128-134.  Where familial separation claims are asserted by the child rather than the parent, they are treated as Fourth Amendment claims.  *See Doe v. Lebbos*, 348 F.3d 820, 826 n. 9 (9th Cir. 2003), overruled on other grounds by *Beltran v. Santa Clara Cnty.*, 514 F.3d 906 (9th Cir. 2008)).  The analysis is the same, however.  *Id.*  Thus, while the Court finds that this claim should be asserted under the Fourth Amendment (and thus may be duplicative of Claims

---

[16] The Court notes that Defendants *may* be arguing that Plaintiff does not state a claim for violation of his substantive due process rights based on familial separation because Defendants' conduct does not "shock the conscience."  *See*  Motion at 18.  Even if the argument were sufficiently raised, Defendants have not cited any authority that suggests that the Court should find, as a matter of law, that under the circumstances alleged here (and drawing all reasonable inferences in favor of Plaintiff), taking A.K. into custody as he watched his father being arrested, transporting him to the police station and then placing him into the custody of strangers rather than leaving him with a well-known family friend, and not returning him to the custody of his father for several days after his father was released, could not meet this standard.

United States District Court
Northern District of California

One through Three as to A.K.), the claim survives Defendant' challenges for the reasons discussed above.[17]

### 8. Claim Seven (Failure to Intervene) (Ayush)

Claim Seven, for failure to intervene, is asserted against Officers Richards and Kraus and is based on the allegation that they "had an opportunity to intervene to prevent other officers from blatantly violating Ayush's and A.K.'s rights under the First, Fourth, Fifth, and Fourteenth Amendments." SAC ¶¶ 135-140.

The Ninth Circuit has held that "[p]ursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), aff'd in part, rev'd in part, 518 U.S. 81 (1996) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986); *Bruner v. Dunaway*, 684 F.2d 422, 425–26 (6th Cir.1982), cert. denied, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *Putnam v. Gerloff*, 639 F.2d 415, 423 (8th Cir.1981); *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)). In *Koon*, the court explained that in failure to intervene cases, "the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *Id.* Although this claim is typically asserted in excessive force cases, Defendants cite no authority that suggests it does not also apply to other constitutional violations.

This claim is, therefore, derivative of Plaintiff's other claims and fails only as to the claims the Court has found are insufficiently pled, namely, the Fourteenth Amendment equal protection and malicious prosecution claims.

### 9. Claim Seven (Failure to Intervene) (A.K.)

The SAC refers to violations of A.K.'s rights as well as Ayush's in this claim. *See, e.g.,* SAC ¶ 135 ("During the course of the incidents described above, several SFPD officers had an opportunity to intervene to prevent other officers from blatantly violating Ayush's and A.K.'s

---

[17] Because Defendants did not challenge A.K.'s familial separation claim on this ground, the Court declines to dismiss it at this juncture on the basis that it is duplicative of Plaintiff's other claims. Plaintiff may wish to reframe this claim, however, if he amends his complaint.

rights under the First, Fourth, Fifth, and Fourteenth Amendments."). The Court's conclusion is the same as to A.K.'s assertion of this claim as it is for Ayush.

### 10.  Claim Nine (*Monell* Claim)

"A local governmental entity may be sued under section 1983 where the alleged constitutional deprivation was inflicted pursuant to an official policy or custom." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001). However, a local government entity cannot be sued under §1983 for an injury inflicted solely by its employees or agents under a respondeat superior theory. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). A government entity is liable under section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

Municipal liability for a constitutional violation "only attaches where (1) the alleged constitutional tort resulted from a municipality's custom, policy, or practice; (2) the tortfeasor was an official 'whose acts fairly represent official policy such that the challenged action constituted official policy'; (3) an official with policymaking authority ratified the tortfeasor's actions; or (4) the municipality failed to adequately train the tortfeasors." *Inmam v. Anderso*n, 294 F. Supp. 3d 907, 921 (N.D. Cal. 2018) (citations omitted).

Bare allegations that some unidentified policy, practice, or custom exists fail to state a claim. *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012); *see also Gonzalez v. Cnty. of Merced*, 289 F. Supp. 3d 1094, 1116 (E.D. Cal. 2017) (where allegations identified only two or three incidents, facts alleged were insufficient to allege a widespread practice of repeated constitutional violations sufficient to state a *Monell* claim). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 2008). An "isolated instance . . . is insufficient evidence of a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by' the County." *Marsh v. County of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) (internal citations omitted). Likewise, mistakes or errors of

United States District Court
Northern District of California

municipal officials do not rise to the level of "policy" sufficient for §1983 liability. *Erdman v. Cochise County, Arizona*, 926 F.2d 877, 882 (9th Cir. 1991).

Where a *Monell* claim is based on failure to train, a plaintiff must show that "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact[,]" that is, that the failure to train was the result of a "conscious or deliberate choice on the part of a municipality." *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (internal quotations and citations omitted).

As a preliminary matter, Plaintiff's *Monell* claim fails as to any policy or practice related to his Equal Protection claim based on  race or gender discrimination because he has not adequately alleged a constitutional violation as to that claim.  Likewise, he cannot state a *Monell* claim based on malicious prosecution as he has not adequately alleged that his constitutional rights were violated in that respect.  As to the remaining claims, his *Monell* claim fails because the SAC contains only conclusory allegations related to the customs, policies or practices that he alleges caused the constitutional violations and he has not alleged any specific facts showing a pattern of violations. Therefore, the Court dismisses the *Monell* claim with leave to amend

## IV.    CONCLUSION

For the reasons stated above, the Motion to Strike is DENIED.  The Motion for Leave to File Second Amended Complaint is GRANTED.  The Motion to Dismiss is GRANTED in part and DENIED in part.  Except as to Claims Five, Eight, Ten and Eleven, which are dismissed with prejudice, Plaintiff may amend the complaint to address the deficiencies identified herein.

In his Third Amended Complaint, Plaintiff should separate out the claims asserted by Ayush from those asserted on behalf of A.K.  In addition, to the extent that those claims are based on different conduct by the various defendants, Plaintiff should assert separate claims such that only defendants who are alleged to have engaged in similar conduct are named for each claim. Every claim must clearly identify which defendants are being sued and whether the claim is being asserted by Ayush or on behalf of A.K.  Likewise, to the extent that Defendants seek dismissal of any claims asserted in the Third Amended Complaint, their motion must address Plaintiff's claims on a claim-by-claim basis and clearly identify the specific claim that is being challenged for every

argument.

Plaintiff's Third Amended Complaint shall be filed by **June 30, 2026**.

**IT IS SO ORDERED.**

Dated:  June 1, 2026

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

38